IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL ACTION NO. 3:23-CV-395-RJC-DCK

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | MEMORANDUM AND |
| ) | RECOMMENDATION |
| ALL CRYPTOCURRENCY, VIRTUAL ) | |
| CURRENCY, FUNDS, MONIES, AND ) | |
| OTHER THINGS OF VALUE, et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |

**THIS MATTER IS BEFORE THE COURT** on the "Motion To Dismiss Complaint For Civil Forfeiture *In Rem*" (Document No. 9). This motion has been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b), and is now ripe for disposition. Having carefully considered the arguments, the record, and applicable authority, the undersigned will respectfully recommend that the motion be **DENIED without prejudice**. The undersigned will further recommend that Plaintiff be directed to promptly file an Amended Complaint.

**I.  BACKGROUND**

**A. Factual Background**

This case arises out of an action commenced by Plaintiff United States of America ("Plaintiff" or "the Government") seeking the forfeiture of cryptocurrencies allegedly derived from a "Crypto Website Spoofing Scheme" conducted by an "unidentified criminal group ('UCG')." (Document No. 1, p. 1). Specifically, the cryptocurrencies seized are claimed to be proceeds of "wire fraud conspiracy and wire fraud in violation of 18 U.S.C. §§ 1343 and 1349, and property involved in money laundering and money laundering conspiracy in violation of 18 U.S.C. §§ 1956,

1956(h), and 1957." Id. at p. 3.  The cryptocurrencies seized were stored or accessible at Binance Holdings Ltd. ("Binance"), owner and operator of the Binance cryptocurrency exchange. Id. at p. 4.  Additionally, the cryptocurrencies seized were associated with the following Binance accounts: (1) "User4 ID #17392912, suspected conspirator Vipin Kumar, and Tron (TRX) Deposit address, TCJvnhLCvCwqEzcYiZKbr9F4pkkiLPGzyv" ("Target Account A"); and (2) "User ID # 159588534, suspected conspirator Rahul Agarwal, and Tron (TRX) Deposit address TEp28dMpzcMo4X1rWb36gJ9HbWd1mqEtXS" ("Target Account B"). Id. at p. 2-3.  Plaintiff alleges that these target accounts did not have a legitimate purpose and existed to "facilitate transactions in assets unlawfully obtained from victims." Id. at p. 10.

The "Crypto Website Spoofing Scheme" allegedly began no later than January 2022. Id. at p. 5.  As part of the scheme, the UCG created a "Phishing Exchanger Website," a website that was meant to mimic the website of a "Legitimate Exchanger"[1] and could be found using different variations of the Legitimate Exchanger Website's internet addresses. Id.  The "Legitimate Exchanger" is a "publicly traded exchanger that serves a legitimate purpose" and maintained a "Legitimate Exchanger Website." Id. at p. 4.  The victims, who were users of the Legitimate Exchanger, would conduct an online search for the Legitimate Exchanger Website and be redirected to the Phishing Exchanger Website. Id. at p. 5.

Once redirected to the Phishing Exchanger Website, the victims were prompted to enter their username and password – consistent with the prompt on the Legitimate Exchanger Website. Id.  "No matter what [information] the user entered… the phishing website indicated that the user's account was disabled or locked and that assistance from a customer service representative

---

[1] Both Binance and the Legitimate Exchanger are considered virtual currency exchangers. Virtual currency exchangers are companies that exchange virtual currencies (cryptocurrencies) for other currencies, such as the U.S. Dollar, and offer a variety of services to account holders that allow them to purchase, sell, transfer, and manage their cryptocurrencies. (Document No. 1, p. 4-5).

2

was required." Id. at p. 6. Thereafter, the UCG, impersonating customer service representatives and under the pretense of assisting with the locked accounts, requested and obtained personal information from the users. Id. Using this information, the UCG gained access to the users' accounts and transferred a variety of virtual currencies out of the accounts. Id. The funds were then laundered through multiple accounts. Id. at p. 2. Through a "myriad of transactions," the funds ultimately landed in Target Account A and Target Account B. Id.

The following are example transactions related to three victims, all resulting from the Crypto Website Spoofing scheme:

| The specified date of the offense | Alleged Victim | Initial Characters of the Ether (ETH) wallet | Received Amount of (ETH) | Amount in USD on Receiving Date[2] | Target Account |
|---|---|---|---|---|---|
| 1/25/2022 | Victim 1 | 0x00f02 | 70.63 | 173,725.08 | Account A |
| 4/16/2022 | Victim 2 | 0xbd85f4 | 52.90 | 161,888.81 | Account A |
| 6/6/2022 | Victim 3 | 0x48283 | 178.56 | 331,864.47 | Account B |

(Document No. 10, p. 8) (citing Document No. 1, p. 7, 9, 10). According to Plaintiff's Complaint, law enforcement traced the funds in the target accounts to the victims listed above and linked the accounts to other victims. (Document No. 10, p. 10). Plaintiff's Complaint estimates that at least $9 million in losses can be attributed to the Crypto Website Spoofing Scheme – approximately $779,374.87 from the specific victims listed. Id. At the time of seizure, Target Account A consisted of approximately 3,400,000 Tether ("USDT"), 100 Ether ("ETH"), and 71,012.46 Polkadot (DOT). Id. at p. 3.

---

[2] This table is taken from the Claimant's "Memorandum Of Law In Support Of Motion To Dismiss" (Document No. 10). The information in columns one through four, and column six, are reflected in the "Complaint For Forfeiture *In Rem*" (Document No. 1) filed by the Government. The information in column five was not provided by the Government in the Complaint and was calculated by Claimant. The undersigned makes no determination about the accuracy of these calculations.

Plaintiff mentions in its response brief that "as of December 2023, criminal charges are pending against one of the conspirators, named Chirag Tomar, who law enforcement arrested as he entered the country in the Atlanta airport in December 2023." (Document No. 11, p. 4); see 3:23-MJ-453.  As of this writing, Defendant Tomar has pled guilty and is awaiting sentencing. See 3:24-CR-076.  Claimant Vipin Kumar, on the other hand, has not been indicted.

B. Procedural History

On June 30, 2023, pursuant to 18 U.S.C. § 981(a)(1)(A) and (C), Plaintiff filed a "Complaint For Forfeiture *In Rem*" (Document No. 1) against (1) all cryptocurrency, funds, monies, and other things of value seized, pursuant to a seizure warrant, from Binance and associated with User ID# 17392912, such User ID associated with the name, Vipin Kumar, and Tether deposit address, TCJvnhLCvCwqEzcYiZKbr9F4pkkiLPGzyv ("Target Account A"); and (2) and all cryptocurrency, virtual currency, funds, monies, and other things of value seized, pursuant to a seizure warrant, from Binance and associated with User ID# 159588534, such User ID associated with the name, Rahul Agarwal and Tron (TRX) deposit address TE28dMpzcMo4X1rWb36gJ9HbWd1mqEtXS ("Target Account B").

On July 3, 2023, a warrant was issued for arrest *in rem* of the Target Accounts. (Document No. 2).  The contents of the Target Accounts were seized in or about December of 2022 through early 2023 and remain in the custody of the United States Secret Service.  (Document No. 1, p. 4, 11).  The Government posted a notice of civil forfeiture on its forfeiture website for thirty consecutive days from November 4, 2023, to December 3, 2023.  (Document No. 3-1).  In response, Vipin Kumar ("Claimant") timely filed a "Verified Claim For Seized Property" (Document No. 6) on December 8, 2023.  In the "Verified Claim For Seized Property," Kumar is

4

claiming ownership of Defendant Properties seized related to Target Account A and is demanding they be returned and/or released. (Document No. 6).

Claimant then filed a "Motion To Dismiss Complaint For Civil Forfeiture *In Rem*" (Document No. 9) on December 28, 2023 regarding the Complaint against Target Account A, along with a "Memorandum Of Law In Support Of Motion To Dismiss" (Document No. 10) on the same day. By the pending motion, Claimant seeks dismissal of Plaintiff's Complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief may be granted, and pursuant to Rule G(5)(b) of the Supplemental Rules for Admiralty or Maritime Claims and Assert Forfeiture Actions. (Document No. 9). Plaintiff filed a "Response In Opposition To Motion To Dismiss Complaint For Forfeiture *In Rem*" (Document No. 11) on January 11, 2024. Claimant filed "Claimant Vipin Kumar's Reply Memorandum In Further Support Of Claimant's Motion To Dismiss Complaint For Forfeiture *In Rem*" (Document No. 12).

The pending motion has been fully briefed and is ripe for review and a recommended disposition to the Honorable Robert J. Conrad, Jr.

## II. STANDARD OF REVIEW

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) tests the "legal sufficiency of the Complaint" but "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992); Eastern Shore Markets, Inc. v. J.D. Assoc. Ltd. Partnership, 213 F.3d 175, 180 (4th Cir. 2000). A Complaint attacked by a Rule 12(b)(6) motion to dismiss will survive if it contains "enough facts to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)); see also Robinson v. American Honda Motor Co., Inc., 551 F.3d 218, 222 (4th Cir. 2009). "A claim has facial

5

Case 3:23-cv-00395-RJC-DCK    Document 14    Filed 08/01/24    Page 5 of 17

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id.

The Supreme Court has also opined that

> Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Specific facts are not necessary; the statement need only "'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" In addition, when ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the Complaint.

Erickson v. Pardus, 551 U.S. 89, 93-94 (2007) (quoting Twombly, 550 U.S. at 555-56).

"Although for the purposes of this motion to dismiss we must take all the factual allegations in the Complaint as true, we are not bound to accept as true a legal conclusion couched as a factual allegation." Papasan v. Allain, 478 U.S. 265, 286 (1986). The court "should view the Complaint in the light most favorable to the plaintiff." Mylan Labs, Inc. v. Matkar, 7 F.3d 1130, 1134 (4th Cir. 1993).

Forfeiture actions *in rem* are governed by Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions ("Supplemental Rules"). Supp. R. G(1).[3] Specifically, Supplemental Rule G(2)(f) governs sufficiency of Complaints for forfeiture *in rem*. To the extent that Supplemental Rule G does not address an issue, Supplemental Rules C and E,

---

[3] In 2006, Supplemental Rule G supplanted Supplemental Rule E(2), which previously governed *in rem* forfeiture actions. Supplemental Rule G(2)(f) now sets the standard for sufficiency of the complaint. See Supp. R. G advisory committee's notes to 2006 adoption. However, the advisory committee noted that the new standard adopted under Supplemental Rule G(2)(f) evolved from case law interpreting Supplemental Rule E(2)(a) and "carries forward this forfeiture case law without change." Id. (citing United States v. Mondragon, 313 F.3d 862 (4th Cir. 2002)).

and the Federal Rules of Civil Procedure, will also apply.  Id.  However, the Federal Rules of Civil Procedure will not apply where they are inconsistent with the Supplemental Rules.  Supp. R. A(2).  The pleading standard set by Supplemental Rule G(2)(f) is higher than the general pleading standard set by Rule 8(a)(2) of the Federal Rules of Civil Procedure.  United States v. 40,000.00 in U.S. Currency, 1:09-CV-383-MR, 2010 WL 2330353, at *2 (W.D.N.C. May 11, 2010).  A more stringent pleading requirement is imposed by the Supplemental Rules to protect those whose assets are seized because "civil forfeiture *in rem* provides the Government with a powerful tool to effectuate an immediate deprivation of property."  Id. (citing United States v. $38.000.00 Dollars in U.S. Currency, 816 F.2d 1538, fn. 20 (11th Cir. 1987)).

Under the pleading requirement set by Supplemental Rule G(2)(f), a complaint must "state sufficiently detailed facts to support a reasonable belief that the Government will be able to meet its burden of proof at trial."  Supp. R. G(2)(f).  This requirement is satisfied "if the Government pleads particular facts demonstrating a 'sufficient connection' between the property seized and the illegal activity."  United States v. $400,000 in United States Currency, 2018 WL 2371098, at *2 (E.D.N.C. May 24, 2018) (citing United States v. Mondragon, 313 F.3d 862, 866 (4th Cir. 2022)).  Overall, the Complaint must state sufficient facts to allow a claimant to "commence an investigation of the facts and to frame a responsive pleading" without having to "mov[e] for a more definite statement."  See Mondragon, 313 F.3d at 864; United States v. Approximately $22,908.66 in United States Currency, 3:22-CV-290-MOC, 2022 WL 10177676, at *2 (W.D.N.C. October 17, 2022).  The Government may rely on circumstantial evidence to meet its burden and may aggregate facts where each one may be insufficient.  Approximately $22, 908.66 in United States Currency, 2022 WL 10177676, at *2 (internal quotations and citations omitted).  For the purposes of a motion to dismiss, courts construe the alleged facts in the light most favorable to the

7

Government. Id. at *2 (citing United States v. $50,040 in U.S. Currency, 2007 WL 117631, at *4 (N.D. Cal. Apr. 20, 2007)).

## III. DISCUSSION

Claimant's "Motion To Dismiss Complaint For Civil Forfeiture *In Rem*" (Document No. 9) asks the Court to dismiss—with prejudice—Plaintiff's Complaint pursuant to Rule 12(b)(6) and Supplemental Rule G(5)(b), for failure to state a claim. (Document No. 10). Specifically, Claimant contends that the Complaint "lacks the factual detail necessary to satisfy the heightened pleading requirement," and "does not state the circumstances giving rise to the forfeiture claim with sufficient particularity that Claimant can commence a meaningful investigation of the facts and draft a responsive pleading." Id. at p. 7, 15. Claimant further alleges that the Complaint does not provide sufficient facts related to the movement of the cryptocurrency before it reached the Binance cryptocurrency exchange, and Target Account A. Id. at p. 11. According to Claimant, the Complaint lacked the following information related to Target Account A:

> (a) Whether there is any connection—let alone a substantial connection—between the cryptocurrency taken from VICTIM ONE and VICTIM TWO's accounts and the cryptocurrency seized from TARGET ACCOUNT A;
>
> (b) The commingling of cryptocurrency;
>
> (c) How and at what point the cryptocurrency was in TARGET ACCOUNT A after the commingling;
>
> (d) On which date(s) the cryptocurrency was placed in TARGET ACCOUNT A after the commingling; and
>
> (e) The intermediaries/wallets that were used between the victims' accounts and Mr. Kumar's account, and to whom they belonged.

Id. at p. 7. Claimant states that he is "entitled" to such information in order to "identify the other wallets" and "have sufficient facts to investigate and trace the assets." Id. at p. 7. Claimant makes

further requests for information for each allegation related to Victims One and Two. See id. at pp. 9-10.

Claimant further argues that the requested information is necessary because such information is not available to him. Id. at p. 10. In his response brief, Claimant states that he has "undergone considerable personal expense in hiring an independent blockchain expert" to conduct a backward tracing analysis of the assets. (Document No. 12, p. 3). However, Claimant contends that the expert is unable to conduct this analysis without "certain critical information," such as specific information about the transactions connecting Claimant's account to the victims' accounts and full ETH wallet addresses. Id. at 3-4. Claimant states that the exchangers involved, known as "centralized Virtual Assert Service Providers ('VASPs')," use operational wallets called "hot wallets." (Document No. 10, p. 10). According to the Claimant, all customer transactions operate through these hot wallets, and "[o]nce the Exchanger's hot wallet receives a transaction on behalf of its customer, through an internal transfer, it sends the cryptocurrency to the customer's account." Id. The problem, as stated by the Claimant, is that the VASPs "do not provide public access to the internal transactions of customer accounts. Id. Thus, by not providing the requested information, Claimant argues that the Complaint "limits further tracing of the stolen funds." (Document No. 10, p. 10). As a result, Claimant contends that the Plaintiff failed to provide an "actual tracing analysis" and "utterly failed to satisfy the tracing requirement of the forfeiture statute, with the facts alleged in this Complaint." Id. at p. 11.

Finally, Claimant relies on the Fourth Circuit's decision in Mondragon both for purposes of distinguishing that case from the current case and "underscor[ing] the importance of the heightened pleading requirement." Id. at p. 13. Claimant notes that while the Fourth Circuit found the pleadings to be sufficient in that case, it did so based on the presence of determinative facts—

supplementing other existing facts— about the location of the funds related to drug trafficking and the experience of the seizing officer.  See id. at pp. 12-13 (citing Mondragon, 313 F.3d at 866). Similarly, Claimant relies on United States v. 155 Virtual Currency Assets, where the Court entered a default judgment in favor of the Government.  Id. at p. 14 (citing 2021 WL 1340971, at *5 (D.D.C. Apr. 9, 2021)).  Claimant distinguishes this case from 155 Virtual Currency Assets, where the court found that the Government provided "documented trails of bitcoin transfers," and among other things, "details about the transactions themselves."  Id. at pp. 14-15 (quoting 155 Virtual Currency Asset, 2021 WL 1340971, at *5).

Claimant contends that, contrary to the referenced cases, the Complaint in this case contains "numerous conclusory allegations," and it does not contain any facts that would support Claimant having any connection to the UCG or to the wallets allegedly under the control of the UCG.  Id. at p. 13.  Claimant states that, while the Government may rely on circumstantial evidence, it cannot rely upon "conclusory allegations."  (Document No. 12, p. 9) (quoting United States v. One Gulfstream G-V Jet Aircraft, 941 F. Supp. 2d 1, 14 (D.D.C. 2013)).

In opposition, Plaintiff disputes Claimant's legal arguments about the sufficiency of the facts alleged and characterizes them as being "requests for information…more properly suited for civil forfeiture discovery." (Document No. 11, p. 1).  While Plaintiff concedes that the Complaint does not include tracing of "millions of dollars" related to the illicit activity and of the "hundreds" of transactions that transpired, it argues that the Complaint describes the scheme and involvement of the Target Accounts with enough depth that would allow the Claimant to "understand and respond."  Id. at p. 8. Plaintiff concludes that such information "satisfies the reasonable belief pleading standard."  Id.  Plaintiff also points out that some information related to the victims—

10

such as names, specific dates of the fraud, and physical locations—were not included to protect the victims, especially considering that a related criminal case remains ongoing.  See id. at p. 4, 5.

Plaintiff further contends that the Complaint does contain at least some of the types of information requested by Claimant in his Motion, and that the law "simply does not require" more details than what has already been provided.  Id. at p. 8 (citing Document No. 10, p. 3). Specifically, Plaintiff states that the relevant rules do not "generally require[] the Government to identify facts with such specificity that the claimant is provided with a step-by-step chronological statement of every single action forming the basis for forfeiture."  Id.  Additionally, Plaintiff argues that the Government is not required to allege tracing of the funds from the underlying illicit conduct in its Complaint.  Id. (citing Medina-Rodriguez v. $3,072,266.59 in U.S. Currency, 471 F. Supp. 3d 465, 480-81 (D.P.R. 2020)).  According to Plaintiff, "[t]his is so particularly in a money laundering case, in which the property subject to forfeiture is not limited to traceable proceeds, but also includes property 'involved in' the money laundering."  Id. at p. 9 (quoting 18 U.S.C. § 981(a)(1)(A)).  Plaintiff further argues that the Government is neither required to "plead facts sufficient to rebut affirmative defenses," nor to "plead facts to meet its ultimate trial burden."  Id. at 10 (internal citations omitted).

Claimant replies to the arguments made by Plaintiff by stating that "there are no facts [included in the Complaint] to support any connection between the cryptocurrency seized from Mr. Kumar's account… and the cryptocurrency acquired from Victim One and Victim Two," or any facts regarding Mr. Kumar's involvement in the alleged illicit activity.  (Document No. 12, p. 6).  Claimant further argues that this is not a "typical civil forfeiture case involving drugs and money where the claimant is found with a considerable amount of cash" and the court is left to determine whether circumstances demonstrate a sufficient connection between the cash and illicit

activity.  Id.  Rather, this is a "highly complex case involving potentially numerous transactions and wallets occurring on the blockchain."  Id. at pp. 6-7. Therefore, while Claimant states that he is not asking for "every single act or transaction in the scheme," he argues that he is entitled to information about the flow of funds between the Victims' accounts and his.  Id. at p. 7 (citing Document No. 11, p. 3).  Responding to Plaintiff's assertion that specific information was left out of the Complaint in order to protect the victims, Claimant states that there is "no conceivable reason" why certain information was left out since he is not requesting specific information related to the victims.  Id. at 10.

This case presents a close call, but ultimately, the Court is not entirely persuaded that Plaintiff's Complaint alleges sufficient facts to establish "a reasonable belief that the [G]overnment will be able to meet its burden of proof at trial."  See Supp. R. G(2)(f).  Specifically, the undersigned is persuaded that the facts alleged in the Complaint as currently written probably do not show a sufficient connection between the money laundering and the cryptocurrencies seized from Target Account A to allow the Claimant to commence a meaningful investigation of the facts or to frame a proper response.  While Claimant's arguments are very persuasive, the undersigned finds that the Government should be given an opportunity to amend its Complaint.  In fact, Plaintiff seems to acknowledge that it might welcome the "opportunity to amend."  (Document No. 11, p. 12, n.4).  Thus, for the reasons explained below, the undersigned will respectfully recommend that the motion to dismiss be denied without prejudice, and that the Government be directed to file an Amended Complaint.

More factual detail is probably necessary to meet the unique pleading standard in forfeiture cases.  After closely reviewing the factual allegations in the Complaint, and construing them in the light most favorable to the Government, the undersigned concludes that the Complaint as currently

written likely falls short of alleging sufficient facts about the flow of funds before reaching Target Account A. The Government diligently details the Crypto Website Spoofing Scheme itself and the deceptive methods used to access each specific victim's account. See (Document No. 1, p. 5-10). Conversely, there is little detail about the "myriad" of transactions that occurred between the time the funds from the victims' accounts were transferred to the UCG's wallets, and the time the funds were transferred into Target Account A. See id.

Plaintiff's Complaint is especially lacking when compared to similar Complaints from other cases concerning civil forfeiture *in rem* of cryptocurrencies, or virtual currencies.[4] In a recent case out of the Western District of Tennessee, the Court granted the Government's request for a default judgment against the defendant properties related to wire fraud and money laundering. United States of America v. Any and All Virtual Currency, Funds, Monies, and Other Things of Value Stored in or Accessible at Binance Associated with User ID 165978850, 2024 WL 1942159, at *3 (W.D. Tenn. May 2, 2024). In that case, not only did the complaint contain more information about the "subject account" itself, but it provided a visual graph summarizing how the funds moved from the victim's Coinbase wallet through three suspect wallets. See Complaint at 6-7, Id. (No. 2:23-CV-02583-SHL-atc), ECF No. 1.

Similarly, in United States of America v. Approximately 1,360,000.748 Tether and $3,859,703.65 in U.S. Currency, the complaint contains two visual graphs showing transaction paths of the relevant funds from the victim's account to the "subject account." Complaint at 9, 11, United States of America v. Approximately 1,360,000.748 Tether and $3,859,703.65 in U.S.

---

[4] In its comparison of this case with other cases, the undersigned does not suggest or recommend the types of information that should be included in Plaintiff's Complaint based on the cases referenced below. The comparisons are merely meant to illustrate the types of information that have been provided in complaints related to forfeiture actions *in rem* against virtual currencies. Given the complex and innately private nature of cryptocurrencies, such comparisons are helpful in assessing the Complaint – especially provided that this is a unique and up-and-coming area in the law.

13

Currency, 2024 WL 348815 (N.D. Cal. Jan. 30, 2024) (No. 3:23-CV-04400-TSH), ECF No. 1. The graphs include details about the amounts transferred in each transaction, the type of currency transferred in and out of each wallet address, the date the transactions took place, and partial wallet addresses. Id. Additionally, a detailed analysis of the transaction paths was included after each graph—including the same information shown on the graphs and more information about the transactions themselves. Id. at 9-15. In granting the Government's request for default judgment, the Court recognized that the complaint was sufficient under Rule G(2)(f). Approximately 1,360,000.748 Tether and $3,859,703.65 in U.S. Currency, 2024 WL 348815, at *8.

The undersigned is not suggesting that a complaint for civil asset forfeiture of cryptocurrency must contain visual graphs or copious details of the laundering transactions to be sufficient to meet the pleading standard under Rule G(2)(f). In United States of America v. 155 Virtual Currency, the court found that the Government provided "documented trails of bitcoin transfers originating from several named organizations." 2021 WL 1340971, at *6. The complaint itself in that case contained relevant details from blockchain analysis. See Complaint, United States of America v. 155 Virtual Currency, 2021 WL 1340971 (No. 1:20-CV-2228-RC), ECF No. 1. As in this case, the complaint there mainly lists partial wallet addresses and the amount of currency transferred. See id. However, the complaint also includes more direct details to connect the transactions that occurred between the defendant properties listed—including the number of transactions that transpired before the funds reached a specific defendant property, the dates of the transactions, and descriptions about the flow of funds between defendant properties. See id.

In contrast, Plaintiff's Complaint provides the following information regarding the flow of funds from Victim One:

> After VICTIM ONE had given access to the account, 70.63 Ether was subsequently transferred out of VICTIM ONE's Legitimate

14

> Exchanger wallet, via two transfers to the UCG at the wallet 0x00f02, and then to multiple decentralized cryptocurrency wallets under the control of the UCG. Ultimately, [the] 73.63 Ether… was moved and converted/exchanged to USDT… commingled with other victim assets, and placed in TARGET ACCOUNT A.

(Document No. 1, pp. 7-8). The Complaint also provides the following information regarding Victim Two:

> After VICTIM TWO had given access to the account, 43.60 Ether was transferred out of VICTIM TWO's Legitimate Exchanger Wallet to multiple decentralized service cryptocurrency wallets under the control of the UCG at 0xbd85f4. Furthermore, 8.81 Ether was consolidated from two other victims and consolidated into VICTIM TWO's transfer for a total of 59.90… [which] was exchanged, commingled, and funded TARGET ACCOUNT A.

Id. at p. 9.

While these descriptions do provide some information about the relevant amounts and wallets involved, it does not seem like enough to allow the Claimant to commence an investigation of the facts or to frame a responsive pleading. The Complaint does not provide any information that would follow the funds from when they were received by the UCG wallets (0x00f02 and 0xbd85f4), to when they were "placed" into or "funded" Target Account A. See (Document No. 1, pp. 7-9). Plaintiff argues that it is not required to "plead every detail of [a] crime." (Document No. 11, p. 8). While the undersigned is cognizant that Plaintiff is not required to include every detail related to the transactions or all facts at its disposal, this must also be balanced with the more stringent pleading standard required under Rule G(2)(f). 40,000.00 in U.S. Currency, 2010 WL 2330353, at *2, *4.

Plaintiff reports in its Complaint that "law enforcement has specifically traced the involvement of the TARGET ACCOUNTS to the fraud on the specific victims described herein." (Document No. 1, p. 10). Plaintiff reiterates in its "Response in Opposition to Motion to Dismiss Complaint for Forfeiture *In Rem*" (Document No. 11, p. 5) that a tracing analysis was completed.

15

Yet, as Claimant notes, the statements that purportedly connect funds seized from Target Account A to the funds received by the UCG wallets are borderline conclusory and do not provide substantive support. See (Document No. 11, p. 13). Here, there is no information provided, beyond general statements, that sheds light on the flow of funds before they were seized from Target Account A – and that would allow Claimant to commence an investigation of facts. Indeed, a reader of the Complaint as currently written must take the Government on blind faith that the funds in the relevant target accounts are traceable to the victims' accounts.

However, the undersigned is not persuaded that all the information demanded by Claimant in his motion to dismiss is necessary, at this stage in the proceeding, in order to meet the standard under Rule G(2)(f). Pursuant to 18 U.S.C. § 983(a)(3)(D), "no Complaint may be dismissed on the ground that the Government did not have adequate evidence at the time the Complaint was filed to establish the forfeitability of the property." As a result, this Court has previously recognized its limited role under these circumstances; the issue is "one of pleading, not of proof at trial," and "[t]he Government is not required to allege in the Complaint all of the facts and evidence at its disposal. "40,000.00 in U.S. Currency, 2010 WL 2330353, at *4 (quoting United States v. $22,173.00 in U.S. Currency, 2010 WL 1257601 (S.D.N.Y. March 30, 2010)). As Plaintiff notably points out, the amount of information Claimant requests in his motion to dismiss is better suited for discovery. See (Document No. 12, p. 1).

Given that on balance the undersigned finds this to be a close call, the undersigned respectfully recommends that the motion be denied without prejudice, and that the Government be directed to promptly file an Amended Complaint.

## IV. RECOMMENDATION

**FOR THE FOREGOING REASONS**, the undersigned respectfully recommends that the "Motion To Dismiss Complaint For Civil Forfeiture (Document No. 9) be **DENIED without prejudice**.

**IT IS FURTHER RECOMMENDED** that Plaintiff be directed to promptly file an Amended Complaint.

## V. TIME FOR OBJECTIONS

The parties are hereby advised that pursuant to 28 U.S.C. § 636(b)(1)(C), and Rule 72 of the Federal Rules of Civil Procedure, written objections to the proposed findings of fact, conclusions of law, and recommendation contained herein may be filed within **fourteen (14) days** of service of same. Responses to objections may be filed within fourteen (14) days after service of the objections. Fed.R.Civ.P. 72(b)(2). Failure to file objections to this Memorandum and Recommendation with the District Court constitutes a waiver of the right to *de novo* review by the District Court. Diamond v. Colonial Life, 416 F.3d 310, 315-16 (4th Cir. 2005); United States v. Benton, 523 F.3d 424, 428 (4th Cir. 2008). Moreover, failure to file timely objections will preclude the parties from raising such objections on appeal. Id. "In order 'to preserve for appeal an issue in a magistrate judge's report, a party must object to the finding or recommendation on that issue with sufficient specificity so as reasonably to alert the district court of the true ground for the objection.'" Martin v. Duffy, 858 F.3d 239, 245 (4th Cir. 2017) (quoting United States v. Midgette, 478 F.3d 616, 622 (4th Cir. 2007)).

**IT IS SO RECOMMENDED**.

Signed: July 31, 2024

*/s/ David C. Keesler*
David C. Keesler
United States Magistrate Judge