IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

CIVIL CASE NO. 3:23-CV-395

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>ALL CRYPTOCURRENCY, VIRTUAL CURRENCY, FUNDS, MONIES, AND OTHER THINGS OF VALUE SEIZED, PURSUANT TO A SEIZURE WARRANT, FROM BINANCE AND ASSOCIATED WITH USER ID # 17392912, SUCH USER ID ASSOCIATED WITH THE NAME, VIPIN KUMAR, AND TETHER DEPOSIT ADDRESS, TCJvnhLCvCwqEzcYiZKbr9F4pkkiLPGzyv; et. al. | **MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT** |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT

NOW COMES Claimant Vipin Kumar ("Claimant"), by and through undersigned counsel, in a civil cause of forfeiture *in rem* and moves this Honorable Court pursuant to Federal Rule of Civil Procedure 12(b)(6) and Rule G(5)(b) of the Supplemental Rules for Admiralty and Maritime and Asset Forfeiture Claims, for an order dismissing the Amended Complaint in the foregoing matter. In support of this motion, Claimant states as follows:

### Factual Background

The United States commenced a civil forfeiture action *in rem* pursuant to 18 U.S.C. § 981(a)(1)(A) and (C), by filing a Complaint for Forfeiture *in Rem* on June 30, 2023 (the "Complaint"). ECF 1. The relevant defendant property is "ALL CRYPTO CURRENCY VIRTUAL CURRENCY, FUNDS, MONIES, AND OTHER THINGS OF VALUE SEIZED,

PURSUANT TO A SEIZURE WARRANT, FROM BINANCE AND ASSOCIATED WITH USER ID # 17392912, SUCH USER ID ASSOCIATED WITH THE NAME, VIPIN KUMAR, AND TETHER DEPOSIT ADDRESS, TCJvnhLCvCwqEzcYiZKbr9F4pkkiLPGzyv." *Id*. ¶ 2. On July 3, 2023, an order and warrant for the arrest of the defendant property was issued, the property was seized and remains in the custody of the United States Secret Service, a federal agency.[1] *Id*. ¶ 7; ECF 2. Claimant filed a Verified Claim on December 8, 2023, claiming and demanding the return and/or release of "[a]ll assets seized related to 'TARGET ACCOUNT A' as defined in Paragraph 2(a) in the Complaint for Forfeiture *in Rem*." ECF 6.[2] On December 28, 2023, Claimant filed a Motion to Dismiss (ECF 9) and a Memorandum of Law in Support thereof (ECF 10), claiming that the Complaint "lack[ed] the factual detail necessary to satisfy the heightened pleading requirements of a civil forfeiture complaint" and failed to allege sufficient facts to permit the court to draw the reasonable inference that the Claimant is liable for the misconduct alleged. ECF 10 at 7.

Specifically, Claimant noted that the Complaint lacks sufficient details, *inter alia*, related to the questions of, (i) Claimant's involvement in the alleged Crypto Website Spoofing Scheme

---

[1] It is unclear from the pleadings how the United States Secret Service seized TARGET ACCOUNT A or where such seizure took place. Further, and as described in detail in this Memorandum of Law, the Amended Complaint does not specifically allege any acts or omissions of Claimant which took place in the Western District of North Carolina. To the extent that such deficiencies exist, this Court cannot exercise jurisdiction over Claimant. *See* 28 U.S.C. § 1355(b). For example, in attempting to establish jurisdiction, the government alleges (a) only one victim from North Carolina - however, there is no further description of their ties to North Carolina, and (b) there is no explanation or justification as to why the Secret Service exercised jurisdiction over the seizure of the cryptocurrency, where it is currently located, or any other indication that the situs of the rem is tied to or located in this district. Without more, the Claimant cannot determine whether jurisdiction is proper or formulate arguments challenging *in rem* jurisdiction. Claimant reserves his right to make further arguments on this issue if it is determined that jurisdiction is lacking.

[2] Claimant requested, and the Government agreed to allow Claimant, additional time to file the Verified Claim in this case.

and with the unidentified criminal group; (ii) evidence of tracing the assets from the victims' account to TARGET ACCOUNT A; (iii) full details of the wallet addresses of the victims identified in the Complaint; (iv) the commingling of cryptocurrency; (v) how and what time the cryptocurrency from the identified victims' accounts was converted to USDT; (vi) the intermediaries/ wallets that were used between the victims' accounts and Claimant's account; (vii) details about the internal transaction once it reached Binance; and (viii) the specific transactions in Claimant's account claimed to be allegedly traced from the victims' account. *See* ECF 10. In this regard, Claimant asserted that these factual details are necessary to allow Claimant to undertake an investigation of the facts and to frame a responsive pleading. Claimant further contended that the Complaint contains numerous conclusory allegations, that the Government failed to provide an actual tracing analysis, and that the Government utterly failed to satisfy the tracing requirement of the forfeiture statute with the facts alleged in the Complaint *Id*.

The Government filed a Response in Opposition to Claimant's Motion to Dismiss on January 11, 2024, arguing*, inter alia*, that "the Complaint set[ ] forth sufficient information and a totality of circumstances that a claimant could conduct his own investigation[.]" ECF 11 at 3. On January 18, 2024, Claimant filed a Reply Memorandum in Further Support of Claimant's Motion to Dismiss. ECF 12. Therein, *inter alia*, Claimant noted that "after careful review and analysis of the Complaint's facts related to the seized assets, as well any transaction details available to Mr. Kumar, the expert [hired by Mr. Kumar to investigate and trace the flow of funds alleged in the Complaint] has concluded that, without certain critical information . . . it is *impossible* to trace the flow of assets from victims' accounts to the assets held in the Binance account owned by Mr. Kumar—critical information that *only the Government can provide* and, indeed, *must provide* to satisfy their pleading burden under Supplemental Rule G(2)." ECF 12 at 3 (emphasis in original).

The Magistrate Judge issued his Memorandum and Recommendation on August 1, 2024 (ECF 14) ("M&R") and the Court adopted the M&R on September 24, 2024. ECF 15. Although the M&R recommended the Court deny Claimant's Motion to Dismiss without prejudice, it specifically notes that, "the Court is not entirely persuaded that Plaintiff's Complaint alleges sufficient facts to establish a reasonable belief that the Government will be able to meet its burden of proof at trial." ECF 14 at 12 (internal quotations and citations omitted). Further, "the undersigned is persuaded that the facts alleged in the Complaint as currently written probably do not show a sufficient connection between the money laundering and the cryptocurrencies seized from Target Account A to allow the Claimant to commence a meaningful investigation of the facts or to frame a proper response." *Id*. The Court then directed the Government to file an Amended Complaint. ECF 15.[3]

On October 15, 2024, the Government filed an Amended Complaint for Forfeiture *in Rem* (the "Amended Complaint"). ECF 16. An amended order and warrant for arrest of the defendant property was issued on November 12, 2024.  ECF 22.

Claimant filed a Verified Claim on December 13, 2024, claiming and demanding the return and/or release of "[a]ll assets seized related to 'TARGET ACCOUNT A' as defined in Paragraph 4(a) in the Amended Complaint for Forfeiture *in Rem*[.]"[4] ECF 23.  As set forth in both the 2023 Verified Claim and 2024 Verified Claim, Claimant does not claim ownership of the assets seized related to 'TARGET ACCOUNT B" as defined in Paragraph 4(b) of the Amended Complaint. ECF 6, ECF 23.

---

[3] The Parties did not file objections to the Magistrate Judge's Memorandum and Recommendation.

[4] The Court granted Claimant's Motion for Extension of Time, extending the deadline to respond to the Amended Complaint to December 13, 2024.

The factual basis for seizure of the defendant property is set forth in the Amended Complaint, which alleges the cryptocurrency was derived by a so-called "'Crypto Website Spoofing Scheme' . . . wherein members of [an alleged] conspiracy fraudulently used a spoofed Coinbase Pro cryptocurrency exchanger website and other means to identify themselves as customer service representatives of legitimate cryptocurrency exchanger Coinbase." ECF 16, Am. Compl. ¶¶ 1, 32-38. The Amended Complaint alleges that when victims accessed the spoofed Coinbase Pro website, which appeared to be the legitimate cryptocurrency exchanger, the conspirators allegedly created the façade that the victims' accounts at the legitimate Coinbase Pro exchanger were locked, causing the victims to "provide sensitive personal information, such as their user names and passwords, and copies of identification documents", so that the conspirators could access the victims' legitimate accounts. *Id*.

According to the Amended Complaint, the conspirators were able to liquidate the victims' accounts of assets held in the legitimate cryptocurrency exchange and then "conducted myriad transactions in proceeds, layering the transactions through multiple accounts and funneling proceeds into and out of accounts in an attempt to obfuscate the origins of the proceeds and make tracking the proceeds all the more difficult." *Id*. ¶ 2. Further, as per the Amended Complaint, "the conspirators used individuals, accounts, and cryptocurrency addresses, in various countries, to deposit, transact in, and 'clean' illicit cryptocurrency, and to provide fiat currency back to the conspirators. These individuals were known as 'blockers' and the accounts/addresses affiliated with the individuals are identified as 'blocker accounts.'" *Id*. Finally, the Amended Complaint alleges that, via this scheme, the conspirators obtained the cryptocurrency, which allegedly was held in the target accounts identified, including a Binance account with User ID 17392912, which is associated with Claimant Vipin Kumar, or "TARGET ACCOUNT A," and such target accounts

are blocker accounts. *Id.* ¶¶ 1-4. The Amended Complaint alleges that the cryptocurrency in TARGET ACCOUNT A is subject to forfeiture because it constitutes or is derived from proceeds of wire fraud conspiracy and wire fraud in violation of 18 U.S.C. §§ 1343 and 1349, and property involved in money laundering and money laundering conspiracy, in violation of 18 U.S.C. §§ 1956, 1956(h), and 1957. *Id.* ¶ 5.

While the Amended Complaint adds a few more details than that provided in the Complaint, it still fails to provide the factual detail necessary to satisfy the heightened pleading requirements of a civil forfeiture complaint by at least "stat[ing] sufficiently detailed facts to support a reasonable belief that the [G]overnment will be able to meet its burden of proof at trial," Supp. R. G(2)(f), and alleging enough facts such that the court may infer that the property is subject to forfeiture. The Amended Complaint also fails to provide sufficient factual detail about how the cryptocurrency allegedly taken from the victims' accounts is related to the cryptocurrency found in Claimant's account, TARGET ACCOUNT A, and as elaborated below, the Amended Complaint does not rectify these deficiencies from the Complaint, but rather adds new victims not previously included in the Complaint and similarly provides insufficient details about them. Such failure is glaring in light of the M&R.

### Legal Standard for Failure to State a Forfeiture Claim

A motion filed pursuant to 12(b)(6) of the Federal Rules of Civil Procedure challenges the legal sufficiency of a complaint. *See Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009). In order to survive a Rule 12(b)(6) motion to dismiss, the facts alleged must be sufficient to "raise a right to relief above the speculative level" and "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). Requiring plausibility "does not impose a probability requirement at the pleading stage." *Id.* at 556. It does, however, demand more

than a "sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Ultimately, a claim has facial plausibility when the plaintiff pleads factual content that permits the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

Under Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions ("Supplemental Rules"), the Government faces "a heightened burden for pleading" in civil forfeiture cases than in actions governed solely by the Federal Rules of Civil Procedure. *United States v. All Assets Held at Bank Julius Baer & Co.,* 571 F. Supp. 2d 1, 16 (D.D.C. 2008). The Government must "allege enough facts so that the claimant may understand the theory of forfeiture, file a responsive pleading, and undertake an adequate investigation." *United States v. One Gulfstream G-V Jet Aircraft*, 941 F. Supp. 2d 1, 14 (D.D.C. 2013) (citation omitted). The Government's pleadings must at least "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial," Supplemental rule G(2)(f), and "allege enough facts such that the court may infer that the property is subject to forfeiture." *Gulfstream Jet*, 941 F. Supp. 2d at 13-14. The "heightened particularity requirement is designed to guard against the improper use of seizure proceedings and to protect property owners against the threat of a seizure upon conclusory allegations." *Id.* at 14 (citation omitted). And, as typically is the case for any type of civil pleading, the Government is obligated to furnish "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555; *Gulfstream Jet*, 941 F. Supp. 2d at 13 ("Although the Supplemental Rules govern, the normal set of rules may help to clarify any ambiguity.").

Prior to 2006, complaints in forfeiture actions were governed by Rule E(2)(a) of the Supplemental Rules for Certain Admiralty and Maritime Claims. Supplemental Rule E(2)(a)

provided then and provides now: "In actions to which this rule is applicable the complaint shall state the circumstances from which the claim arises with such particularity that the defendant or claimant will be able, without moving for a more definitive statement, to commence an investigation of the facts and to frame a responsive pleading." Suppl. R. E(2)(a). The requirement is satisfied "if the Government pleads particular facts demonstrating a 'sufficient connection' between the property seized and the illegal activity." *United States v. $400,000 in United States Currency*, NO. 5:17-CV-398-FL, NO. 5:17-CV-485-FL, 2018 WL 2371098, at *2 (E.D.N.C. May 24, 2018) (citing *United States v. Mondragon*, 313 F.3d 862, 866 (4th Cir. 2002)). In 2006, these Rules were amended and renamed the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture actions. *See* Rule G of Supplemental Rules, Advisory Committee's Note on 2006 adoption; *see also* 12 Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, Federal Practice and Procedure § 3261 (2d ed. Supp. 2008). Under Rule G of the Supplemental Rules, a complaint in an *in rem* forfeiture case must "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial." Suppl. R. G(2)(f). The Advisory Committee's Note, however, clarifies that it adopts the standard that evolved in case law interpreting the earlier Rule E(2)(a) requirement and is intended to "carr[y] this forfeiture case law forward without change." Suppl. R. G, Advisory Committee's Note on 2006 Adoption (citing *United States v. Mondragon*, 313 F.3d 862, 865 (4th Cir. 2002)). Thus, read in conjunction, the Supplemental Rules require the Government to allege enough facts to "support a reasonable belief that the government will be able to meet its burden of proof at trial," to allow Claimant "to commence an investigation of the facts and to frame a responsive pleading," Suppl. R. G(2)(f); E(2)(a), such that the court may infer that the property is subject to forfeiture. *United States v. $22,173.00 in U.S. Currency,* No. 09 Civ. 7386(SAS), 2010 WL 1328953, at *2 (S.D.N.Y. Apr. 5,

2010); *see* Suppl. R. G, Advisory Committee Notes (noting that the "reasonable belief" standard in Rule G(2)(f) mirrors the sufficiency standard that was previously codified in Rule E(2)).

Although both the Federal Rules of Civil Procedure and the Supplemental Rules govern the analysis, the Supplemental Rules trump in the event of an inconsistency. *See* Suppl. R. A(2). Moreover, because civil forfeiture *in rem* permits immediate seizure of property before any pre-deprivation process or judicial review, the Supplemental Rules require more particularity than Rule 8(a)(2) of the Federal Rules of Civil Procedure, which requires only a "short and plain statement" of the claim. *See United States v. $40,000 in U.S. Currency*, No. 1:09cv383, 2010 WL 2330353, at *2 (W.D.N.C. May 11, 2010). In light of this particularity requirement, the pleading standard under Supplemental Rule G(2)(f) is "more stringent than the general pleading requirements found in the Federal Rules of Civil Procedure." *Id*. at *2 (citing *United States v. $38,000.00 Dollars in U.S. Currency*, 816 F.2d 1538, n. 20 (11th Cir. 1987)); *see also United States v. $2,200,000 in U.S. Currency*, Civil Action No. ELH–12–3501, 2014 WL 1248663, at *6 (D. Md. Mar. 26, 2014) (noting that the "pleading standard under [Supplemental Rules] is higher than the standard for Fed. R. Civ. P. 8(a)"). Thus, the standards set forth in Supplemental Rules impose a pleading that is more exacting than the liberal notice pleading standard contemplated by Rule 8(a)(2). *See All Assets Held at Bank Julius Baer & Co.*, 571 F. Supp. 2d at 16 ("Rule G (and its predecessor Rule E(2)) creates a heightened burden for pleading on the plaintiff."); *cf.* Fed. R. Civ. P. 8(a)(2); *see also Mondragon*, 313 F.3d at 865 (4th Cir. 2002); 12 WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 3242 (2d ed. 1997) (noting that the supplemental rules "require[ ] a more particularized complaint than is demanded in civil actions generally," and that "added specifics is thought appropriate because of the drastic nature of those remedies").

## Argument

In the present action, the Government has failed to establish the facial plausibility of its right to relief as required under Fed. R. Civ. P. Rule 12(b)(6) by failing to plead sufficient factual content that permits the court to draw the reasonable inference that Claimant is liable for the misconduct. The Amended Complaint lacks the factual detail necessary to satisfy the heightened pleading requirements of a civil forfeiture complaint by at least "stat[ing] sufficiently detailed facts to support a reasonable belief that the [G]overnment will be able to meet its burden of proof at trial," Supplemental Rule G(2)(f), and "alleg[ing] enough facts such that the court may infer that the property is subject to forfeiture." *Gulfstream Jet*, 941 F. Supp. 2d at 14; *see also* Suppl. R. E(2)(a) ("complaint shall state the circumstances from which the claim arises with such particularity that the defendant or claimant will be able, without moving for a more definitive statement, to commence an investigation of the facts and to frame a responsive pleading.").

The Government has failed to allege facts sufficient to show that the claimed property from TARGET ACCOUNT A is derived from or traceable to illicit activity. Specifically, the Amended Complaint lacks sufficient detail related to the questions of (a) whether there is any connection— let alone a substantial connection—between the cryptocurrency taken from the victims identified and the cryptocurrency seized from TARGET ACCOUNT A; (b) the amount of cryptocurrency derived from each identified victims' account which is traceable to TARGET ACCOUNT A; (c) the commingling of cryptocurrency from the time it left the identified victims' accounts until it reached TARGET ACCOUNT A; (d) details such as the date, time, and the platform of conversion of cryptocurrency to Tether ("USDT"); (e) on which date(s) the cryptocurrency was placed in TARGET ACCOUNT A, especially of VICTIM ONE (as mentioned at paragraph 42 of the Amended Complaint), those related to "additional five victims" (as mentioned at paragraph 68 of

10

the Amended Complaint) and an "additional victim" (as mentioned at paragraph 71 of the Amended Complaint); (f) the intermediaries/wallets that were used between the identified victims and TARGET ACCOUNT A, and to whom such intermediaries/ wallets belonged; and, critically, (g) how Claimant Vipin Kumar is allegedly connected to the unnamed criminal group as a blocker, or how TARGET ACCOUNT A is a "blocker account".

The Amended Complaint makes reference to multiple victims of the alleged conspiracy and references Ethereum ("ETH") wallets that were allegedly involved in the spoofing scheme and transmitted stolen funds in the ETH Network. According to the Amended Complaint, the detected cryptocurrency was stored on TARGET ACCOUNT A and TARGET ACCOUNT B at the time of seizure of the assets by the United States Secret Service. ECF 16, Am. Compl. ¶ 1-5.

With respect to the ETH transferred from VICTIM ONE's account, the Amended Complaint merely alleges:

> After VICTIM ONE had given access to the account, 70.63 Ether was subsequently transferred out of VICTIM ONE's Coinbase wallet, via two transfers to the conspirators at the wallet 0x00f02, and then to multiple decentralized cryptocurrency wallets under the control of the conspirators. Ultimately, this 70.63 in Ether derived from VICTIM ONE was moved and converted/exchanged to USDT (other victim assets were converted/exchanged in a similar manner), commingled with other victim assets, and placed in TARGET ACCOUNT A at the Binance cryptocurrency exchange.

*Id*. ¶ 42.

This narrative is nearly identical to the allegation set forth by the Government in the Complaint (ECF 1, Compl. ¶ 26) which Claimant in his Memorandum of Law in Support of the Motion to Dismiss dated December 8, 2023, (ECF 10) and in his Reply Memorandum in Further Support of Claimant's Motion to Dismiss dated January 18, 2024 (ECF 12) noted is insufficient to frame a responsive pleading and lacks critical information to enable an expert to trace the flow of cryptocurrency. Regarding VICTIM ONE, such critical information included, (i) the unabridged

version of the ETH wallet addresses where the cryptocurrency of the victim was initially transferred; (ii) the full wallet address of the wallet 0x00f02 under the control of the unidentified criminal group as defined at paragraph 1 of the Complaint; (iii) the entire chain of transactions of the 70.63 ETH from VICTIM ONE's account to TARGET ACCOUNT A; (iv) details of the "multiple decentralized cryptocurrency wallets under the control of the UCG"; (v) details of the conversion of ETH to USDT, including the platform on which it was converted, the date of conversion and the commingling of other cryptocurrency; and (vi) the specific transfer which is alleged to have placed VICTIM ONE's cryptocurrency in TARGET ACCOUNT A. *See* ECF 10, ECF 11.

Notably, the Court, by its adoption of the M&R, determined that the Government's original allegation concerning VICTIM ONE was not "enough to allow the Claimant to commence an investigation of the facts or to frame a responsive pleading." ECF 14 at 15. Despite that, the Government has done nothing to rectify these deficiencies in the Amended Complaint and Claimant remains without sufficient facts to investigate and trace the assets from VICTIM ONE to the TRON deposit addresses belonging to TARGET ACCOUNT A and frame a responsive pleading.

With respect to the allegations related to VICTIM TWO, the Amended Complaint fails on several counts.

**First**, it is entirely unclear how much cryptocurrency related to VICTIM TWO the Government is alleging is connected to TARGET ACCOUNT A. As per the Amended Complaint, 43.60 ETH was transferred out of VICTIM TWO's Coinbase wallet. ECF 16, Am. Compl. ¶ 46. Thereafter, 8.81 ETH were "consolidated into VICTIM TWO's transfer for a total of 52.90

[ETH]." *Id*. Yet, the sum of 43.60 ETH and 8.81 ETH is not 52.90 ETH – it is 52.41 ETH. The Amended Complaint provides no explanation for this discrepancy.

Further discrepancies abound. For example, the Amended Complaint notes that, "assets from **multiple additional victims not identified by number herein**, in the amount of 8.81 Ether, were commingled with the 43.60 Ether derived from VICTIM TWO" (*Id*. ¶ 62 (emphasis in original)) and, "VICTIM TWO's assets, totaling 51.6 ETH, left Coinbase" *Id*. ¶ 63. Nowhere, save for the flow chart on page 19 ("2 transfers"), does the Government elaborate on this discrepancy. *Id*. at 19.  Did the two transfers from VICTIM TWO's wallet occur on the same day? Over a period of days? The Amended Complaint, as written, fails to provide an answer. Moreover, the Amended Complaint does not provide details of the date and time of conversion of ETH to USDT nor the conversion rate the Government applied. Thus, Claimant has no way to ascertain how much ETH out of 52.95419904 was converted to USDT and no way to determine whether the tainted USDT or untainted USDT allegedly reached the address "Gzyv".

**Second**, the flow chart provided in the Amended Complaint is unreliable. The Amended Complaint notes that the flow chart omits some hopping steps "for the sake of simplicity." *Id*. ¶ 60. Such omissions entirely undermine the objective of the flow chart, which is to sufficiently provide a tracing analysis and relevant information to Claimant so that Claimant may undertake an investigation of the facts and frame a responsive pleading.

In the M&R, the Court gave examples of case law wherein more direct details were given to connect the transactions that occurred between the defendant properties listed—including the number of transactions that transpired before the funds reached a specific defendant property, the dates of the transactions, sufficient connection between the illegal activity and the seized property, and detailed descriptions about the flow of funds between defendant properties. ECF 14 at 13-14.

By omitting such "hops", the Government has prevented Claimant from undertaking his own investigation to frame a responsive pleading.

The Government itself agrees that the flow of assets to fund TARGET ACCOUNT A was even more complex than depicted and involved hops and multiple transactions. ECF 16, Am. Compl. ¶ 60. Thus, by failing to provide the complete tracing analysis, the Government fails to meet the heightened pleading requirement of a civil forfeiture action.

Further, the Amended Complaint contains no explanation describing the change in the amount of ETH during the tracing either in the flow chart or anywhere in the Amended Complaint. For example, the Amended Complaint alleges that 51.6 ETH was transferred from the address "d4cf" to "72ac". ECF 16, Am. Compl. ¶ 63. Then, according to the flow chart on page 19, 52.90842345 ETH was transferred from the address "72ac" to "d7a9". *Id*. at 19. Thereafter, 52.95084006 ETH was transferred from the address "d7a9" to "Ddac", and thereafter, 52.95419904 ETH was transferred from the address "Ddac" to "cf18". *Id*. Another issue is that the flow chart selectively omits the date and time of the conversion from ETH to USDT. *See Id*.

The starkest absence of information and connection in the flow chart is the lack of transfer from the address "cf18" to "91RL". *See Id*. The Amended Complaint fails to elaborate on how the cryptocurrency was transferred from the address "cf18" to "91RL", it merely notes that on April 18, 2022, 187,664 USDT was transferred from "cf18" to "Gzyv", the address associated with TARGET ACCOUNT A. *Id*. at 19, ¶ 63. As per the Amended Complaint, the address "Ddac" is a MEXC address known to be affiliated with the conspirators committing the Coinbase Spoofing Scheme. *Id*. ¶ 63. However, the flow chart labels the address "Ddac" as associated with "coinbasepro.com". *Id*. at 19. Further, nowhere does the Amended Complaint note that the address "91RL" (which is the address that ultimately transfers the cryptocurrency to the TARGET

ACCOUNT A (*Id*.)) is associated, directly or indirectly, with the conspirators. Thus, the Government has failed to make a connection between the cryptocurrency seized from Claimant's account to any illicit activity in VICTIM TWO's account.

For the first time in the Amended Complaint, the Government has alleged, although insufficiently, that cryptocurrency from another victim's ("VICTIM FOUR") account has funded TARGET ACCOUNT A. *Id*. ¶ 64. With respect to VICTIM FOUR, the Amended Complaint fails on similar grounds as VICTIM TWO.

**First**, it is entirely unclear how much cryptocurrency related to VICTIM FOUR allegedly reached TARGET ACCOUNT A. As per the Amended Complaint, VICTIM FOUR was defrauded of 12.83 ETH. *Id*. ¶ 66. However, in the same paragraph, the Amended Complaint notes that, "[A]t least **20.9** Ether of VICTIM FOUR's assets, after being commingled with other victims' assets were deposited in TARGET ACCOUNT A. *Id*. The Government has not provided any explanation for this discrepancy of 8.07 ETH. When was the additional ETH taken from VICTIM FOUR's account? How? In addition, the Amended Complaint also does not provide details of the date, time, or platform of conversion of ETH to USDT nor the conversion rate the Government applied. *See Id*. ¶ 67. *See also Id*. at 21. Thus, Claimant has no way to ascertain how much ETH out of 12.83 was converted to USDT and thus allegedly reached the address "Gzyv".

**Second**, the flow chart provided in the Amended Complaint is unreliable. In the flow chart there is no explanation of the change in the amount of USDT during the tracing. *See Id*. For example, after the 12.83 ETH was converted to USDT, the flowchart indicates that 255,132.897101 USDT was transferred from the address "5b67" to "e87b". *Id*. Thereafter, only 30,000 USDT was transferred from the address "e87b" to "Ddac". *Id*. There is no way for Claimant to determine whether the allegedly tainted USDT was transferred from the address "e87b" or the

untainted portion of the USDT was transferred. Eventually 31,172 USDT reaches the address "Gzyv" from "91RL." *Id*. Nowhere does the Amended Complaint provide any explanation for this discrepancy. Further, the flow chart lacks details of any transfer from the address "cb88" to "RGfn". *See Id*. At no point does the Amended Complaint elaborate upon how the cryptocurrency was transferred from the address "cb88" to "RGfn", it merely notes that on May 9, 2022, 29,999 USDT was transferred from "RGfn" to "91RL" and then 31,172 USDT was transferred to the address "Gzyv". *Id*. As per the Amended Complaint, the address "Ddac" is a MEXC address known to be affiliated with the conspirators committing the Coinbase Spoofing Scheme. *Id*. ¶ 63. However, the flow chart labels the address "Ddac" as associated with "coinbasepro.com". *Id*. at 21. Nowhere does the Amended Complaint note that the address "RGfn" or "91RL" is associated, directly or indirectly, with the conspirators. Thus, the Government has failed to make a connection between the cryptocurrency seized from Claimant's account to any illicit activity in VICTIM FOUR's account.

Additionally, the Government, for the first time insufficiently alleges that assets from an additional five victims' accounts have allegedly funded TARGET ACCOUNT A. *Id*. ¶ 70. With respect to the additional five victims, the Amended Complaint fails on similar grounds as VICTIM TWO and FOUR.

**First**, the Amended Complaint, similar to the Complaint, does not provide the full wallet addresses of these additional five victims. *See Id*. The Amended Complaint also does not provide details of the date, time, or platform of conversion of ETH to USDT nor the conversion rate the Government applied. *See Id*. *See also Id*. at 23. Thus, Claimant has no way to ascertain how much ETH out of 86.5 was converted to USDT and thus allegedly reached Claimant's Binance account.

**Second**, the flow chart associated with the tracing of additional five victims is unreliable. The Amended Complaint notes that ETH from 5 victims was commingled and sent to the address "e6f0". *Id*. ¶ 70. However, the flow chart only shows 3 victims. *See Id*. at 23. Further, the flow chart plainly states that "Binance records show that the address 9b30 sent 99,999 USDT to Kumar's Binance account on 02/01/2022", without any further particulars or these records. *Id*. As noted in the Memorandum of Law in support of Claimant's Motion to Dismiss dated December 8, 2023 (ECF 10), the internal transactions of Binance are not publicly available. *Id*. at 10. Thus, by not having access to the full chain of transactions, Claimant is unable to meaningfully commence an investigation of the facts and to frame a responsive pleading.

In addition, the Amended Complaint notes that 99,999 USDT were sent directly from the address "9b30" to TARGET ACCOUNT A. ECF 16, ¶ 70. However, as per the flow chart, 399,878.839411 USDT were sent from the address "9b30" to the address "d681" not to TARGET ACCOUNT A. *Id*. at 23. No explanation has been provided to explain this discrepancy. Worse, the flow chart contains no explanation of the change in the amount of USDT during the tracing. *See Id*. For example, the Amended Complaint alleges that after the ETH was converted to USDT, 208,315.908482 USDT were transferred to the address "9b30", thereafter 399,878.839411 USDT was sent to the address "d681", and, eventually, 99,999 USDT allegedly reached Claimant's Binance Account. *Id*. There is no way for Claimant to determine whether the tainted USDT was transferred from the address "d681" or the untainted portion of the USDT was transferred.

For the first time, the government also, insufficiently, alleges that funds from an additional victim's account were deposited into TARGET ACCOUNT A. *Id*. ¶ 71. With respect to the additional victim, the Amended Complaint fails on similar grounds as the additional five victims.

**First**, the Amended Complaint, similar to the Complaint, does not provide the full wallet addresses of the additional victim. *Id*. ¶ 73. *See also Id*. at 24. The Amended Complaint also does not provide details of the date, time, or platform of conversion of ETH to USDT nor the conversion rate the Government applied. *Id*. ¶ 73. *See also Id*. at 24. Thus, Claimant has no way to ascertain how much ETH out of 37.49 was converted to USDT and thus allegedly reached the Claimant's Binance account.

**Second**, the flow chart associated with the tracing of the additional victim is unreliable. *See Id*. The Amended Complaint notes that assets from an additional victim flowed to TARGET ACCOUNT A. *Id*. ¶ 71. However, the flow chart does not begin with the flow of funds from one address but two different addresses. *See Id*. at 24. No explanation or detail has been provided regarding who the second address belongs to, or which address belongs to the alleged additional victim. *See Id*. Rather, the flow chart notes that "Binance account with deposit address d681 sent 62,629 USDT to Kumar's Binance account internally on 04/29/22". *Id*. As described above, by not having access to the full chain of transactions, Claimant is unable to meaningfully commence an investigation of the facts and to frame a responsive pleading.

Further, in the flow chart, there is no explanation of the change in the amount of USDT during the tracing. *See Id*. For example, after the ETH was converted to USDT, 111,746.795284 USDT were transferred to the address "9b30", thereafter, 128,266.294861 USDT was sent to the address "e87b", and then 189,810.18981 USDT was sent to the address "d681". *Id*. However, the same flow chart then claims that 62,629 USDT reached Claimant's Binance Account. *Id*. There is no way for Claimant to determine whether the allegedly tainted USDT was transferred from the address "d681" or the untainted portion of the USDT was transferred.

From the foregoing, it is clear that the Government has not identified sufficient information for Claimant to effectively investigate and formulate a response to the allegations of the Amended Complaint nor has the Government established sufficient connection between the cryptocurrency stolen from the identified victims to the cryptocurrency seized from TARGET ACCOUNT A.

The Government has also failed to identify any connection between Claimant and the "Crypto Website Spoofing Scheme". The Amended Complaint also fails to substantiate its allegation that Claimant is a "blocker", and the TARGET ACCOUNT A is a "blocker account". Surely, if Claimant were truly involved in such scheme, the Government would have actual, detailed allegations—and need not rely on such conclusory statements. Unfortunately, such conclusory statements are all the Amended Complaint alleges.

As noted at Paragraph 4(a) of the Amended Complaint, at the time of the seizure the contents of TARGET ACCOUNT A consisted of at least approximately 3,400,000 USDT, 100 ETH, and 71,012.46 Polkadot ("DOT"). *Id*. ¶ 4. Yet, at no point does the Amended Complaint— or the Complaint for that matter—connect the Polkadot and ETH seized from TARGET ACCOUNT A to the alleged victims, who all lost ETH.

Incredibly, the government has seized 3,400,000 USDT, 100 ETH and 71,012.46 DOT, while, at most, alleging a connection to the following USDT of each identified victim to the USDT in TARGET ACCOUNT A.

| Date of transfer to TARGET ACCOUNT A | Alleged Number of the Victim(s) | Alleged Received Amount (USDT) |
|---|---|---|
| 1 February 2022 | Additional Five Victims | 99,999 |
| 18 April 2022 | VICTIM TWO | 187,664 |
| 29 April 2022 | Additional Victim | 62,629 |

| 9 May 2022 | VICTIM FOUR | 31,172 |
|:---:|:---:|:---:|
| **TOTAL** | | **381,464** |

The Government continues to hold millions of dollars of assets without tying such assets to the cryptocurrency in TARGET ACCOUNT A or any illicit activity conducted by Claimant, nor has the Government provided sufficient details to meet the heightened pleading standard so that Claimant can conduct his own investigation and frame responsive pleadings. To satisfy the pleading requirements, the Government must show "it will be able to trace the proceeds of [the] alleged criminal activity to the purchase of the Property." *United States v. One Partially Assembled Drag Racer*, 899 F. Supp. 1334, 1341 (D.N.J. 1995); 18 U.S.C. § 981(a)(1)(A) (forfeiture of property "involved in" or "traceable to" money laundering violations). As elaborated above, the Amended Complaint has failed to establish the chain of transactions from the time cryptocurrency left the identified victims' accounts until it reached TARGET ACCOUNT A. Further, especially for such additional victims, it is entirely unclear what happened to the cryptocurrency once it reached the Binance cryptocurrency exchange and before it allegedly made its way into TARGET ACCOUNT A.

The Government has utterly failed to satisfy the tracing requirement of the forfeiture statute with the facts alleged in the Amended Complaint. In cases involving civil forfeiture, courts have recognized that legitimately obtained property may be seized if such property was used to facilitate money laundering. *See United States v. Contents of Account Numbers 208-06070 and 208-06068-1-2*, 847 F. Supp. 329, 335 (S.D.N.Y. 1994) ("*Contents of Account Numbers*") (finding that the government demonstrated probable cause to allege that numerous accounts were "maintained solely for the purpose of disguising the source of the proceeds of . . . illegal activity."). However, in cases where funds transfer through numerous commingled accounts, "**innocent funds are not**

**forfeitable simply because they have been commingled with tainted funds**." *See e.g.*, *United States v. Contents in Account No. 059-644190-69*, 253 F. Supp. 2d 789, 799-800 (D.Vt. 2003) ("If the tracing requirement in § 981 is to be given any effect—as, indeed, it must—then the government is required to demonstrate something more than the fact of commingling, even across a series of complicated transactions, to establish that legitimate money is forfeitable by virtue of its commingling with tainted funds"); *see also United States v. BCCI Holdings (Luxembourg), S.A.,* 961 F. Supp. 287, 304 (D.D.C. 1997) (in RICO forfeiture action, applying tracing rules and noting that "[w]hen tainted and untainted funds are commingled in a specific account, accounting principles have been applied to trace the funds"). The Government specifically took on this tracing burden when it elected to proceed under 18 U.S.C. § 981. *See Contents in Account*, 253 F. Supp. 2d at 794.

Further, in such cases where the Government has failed to allege that seized accounts are "controlled, nominally or effectively, by anyone with even a partially illegal purpose," there can be no basis for the seizure of the entire contents of such accounts. *See Marine Midland Bank v. United States*, Nos. 93 Civ. 0307 (RPP), 93 Civ. 0357 (RPP), 1993 WL 158542 at *7 (S.D.N.Y. May 11, 1993), *adhered to on reconsideration*, 1993 WL 248796 (June 28, 1993), *aff'd in part, remanded in part*, 11 F.3d 1119 (2d Cir. 1993). *See also Contents of Account Numbers* 847 F. Supp. at 335 (S.D.N.Y. 1994) (discussing *Marine Midland Bank*); *United States v. Tencer*, 107 F.3d 1120, 1134 (5th Cir. 1997) ("[M]erely pooling tainted and untainted funds in an account does not, without more, render that account subject to forfeiture.").

A leading case in the Fourth Circuit for the pleading requirements in a civil forfeiture complaint is *United States v. Mondragon*, 313 F.3d 862 (4th Cir. 2002), the same case cited by the Advisory Committee Note on the 2006 adoption of Rule G of the Supplemental Rules. In

*Mondragon*, an *in rem* proceeding against seized currency related to drug trafficking, the Court applied the standard that "a complaint under Rule E(2)(a) must allege sufficient facts to support a reasonable belief that the property is subject to forfeiture." *Id*. at 865. The court ultimately found that the complaint satisfied the pleading requirements of Supplemental Rule E(2)(a). However, in reaching its decision, the court noted the following facts: (1) a search of the claimant's vehicle uncovered a hidden compartment with electronic spring locks; (2) the installation job of this hidden compartment was professionally done; (3) the officer who seized the funds had seen many such secret compartments and knew they were routinely used by drug traffickers to transport large quantities of drugs and cash proceeds from drug transactions; (4) the officer found nearly $500,000 sealed in fifteen plastic bags; (5) a drug dog brought to the scene gave a positive identification to the back seat area of the car; (6) claimant had an additional $5,900 cash in her purse; (7) claimant was driving with a revoked, out-of-state license; and (8) the complaint contained a joint affidavit from the arresting officer and from a U.S. Customs official. *Id*. at 866. Notably, the allegation in *Mondragon* that half a million dollars was found in the car was not sufficient to satisfy the pleading requirements. The Court found:

> The complaint alleges that Sergeant Quill, in his search of the car driven by Mondragon, found nearly one half million dollars sealed in fifteen plastic bags. The presence of that much cash, oddly packaged, ***could raise a suspicion that someone was up to no good, but without more it does not suggest a connection to drug trafficking***.

*Id*. (emphasis added). The court in *Mondragon* then went on to explain that the determinative facts were that the money was hidden; that it was hidden in a professionally installed secret compartment with electronic spring locks; that the seizing officer was experienced in drug investigations; that the seizing officer knew that hidden compartments are routinely used by drug dealers; and that the drug dog alerted on the back seat. *Id*.

The facts in the instant case are far different than those in *Mondragon*, but the decision underscores the importance of the heightened pleading requirements. The Amended Complaint here contains numerous conclusory allegations, including the fact that there were "multiple decentralized cryptocurrency wallets *under the control of the conspirators*." ECF 16, Am. Compl. ¶ 42. Indeed, as noted above, the Amended Complaint, apart from making a conclusory statement that Claimant is a blocker and that TARGET ACCOUNT A is a blocker account, does not allege that Claimant is a member of such conspiracy or that Claimant acted with "even a partially illegal purpose". *See Marine Midland Bank*, 1993 WL 158542 at *7 (S.D.N.Y. May 11, 1993). Nor does the Amended Complaint allege that the intermediary wallets that were supposedly under the control of the unnamed "conspirators" bear any relationship to Claimant.

Additionally, the Amended Complaint alleges that the "TARGET ACCOUNTS did not have any legitimate purpose or obtain funding from legitimate sources. Instead, the TARGET ACCOUNTS existed to receive assets and facilitate transactions unlawfully obtained from victims." ECF 16, Am. Compl. ¶ 76. This conclusory statement, without ***any facts*** to support it, does not satisfy the heightened pleading requirement for civil forfeiture pleadings, which is designed to guard against the improper use of seizure proceedings and protect property owners. *See Gulfstream Jet*, 941 F.Supp. 2d at 14.

Here, it is also important to note that Claimant's currency at Binance was not "secreted" like it was in *Mondragon*. Despite the Government's effort to attribute criminality to cryptocurrency, the fact that Claimant invests in cryptocurrency is not a crime or suspicious at all, as cryptocurrency has become an increasingly popular investment in recent years, made evident by the alleged victims' investment of the same. As set forth in both the 2023 Verified Claim (ECF 6) and the 2024 Verified Claim (ECF 23), Mr. Kumar is an innocent purchaser of cryptocurrency

that was seized from TARGET ACCOUNT A, which may or may not have any traces to cryptocurrency tied to illegal activity. ECF 6; ECF 23. In any event, Mr. Kumar lawfully purchased the coins in the Binance account associated with USER ID 17392912 and he accumulated the cryptocurrency investments through peer-to-peer cash transactions. ECF 23.

Worse, the Government has failed to allege—outside of its sweeping, conclusory allegations—that Mr. Kumar controlled such accounts "with even a partially illegal purpose." *See Marine Midland Bank*, 1993 WL 158542 at *7 (S.D.N.Y. May 11, 1993). Despite this failure, the Government seeks the forfeiture of all 3,400,000 USDT (approximately 3,400,000 USD) contained in TARGET ACCOUNT A when only 381,464 USDT (approximately 381,464 USD) has been alleged to be connected to the victims. This is only approximately 10% of the seized USDT. Additionally, no connection has been shown to the seized ETH or DOT. Even if the Government has sufficiently connected VICTIMS ONE, TWO, and such additional, unidentified victims to Claimant—***which, again, it has not***, the Government cannot seize ***all property*** found in TARGET ACCOUNT A and must return the remaining 3,018,536 USDT (approximately 3,018,536 USD), 100 ETH (approximately 393,500 USD), and 71012.46 DOT (approximately 657,909 USD) that the Government does not allege has any connection to any alleged victim.

Because the Government has failed to allege sufficient facts necessary to satisfy the heightened pleading requirements of a civil forfeiture complaint to establish a reasonable basis to believe that the Government will be able to meet its burden of proof at trial and to allow Claimant to commence an investigation of the facts and to frame a responsive pleading, this Court should dismiss the Complaint and release all funds seized from Claimant.

## Conclusion

The Government seeks to deprive an innocent Claimant of his interest in the claimed property (all the cryptocurrency from TARGET ACCOUNT A), by alleging that at least some of the cryptocurrency is "involved in" or traceable to purported money laundering and wire fraud offenses. ECF 16, Am. Compl. ¶¶ 1-5. But the heightened particularity requirements of the Amended Complaint pursuant to Rule G(2)(f) have not been satisfied. The Amended Complaint's factual allegations do not permit a reasonable belief for pleading purposes that the cryptocurrency that was seized from TARGET ACCOUNT A constitutes or was derived from proceeds of wire fraud conspiracy and wire fraud in violation of 18 U.S.C. §§ 1343 and 1349, or property involved in money laundering and money laundering conspiracy, in violation of 18 U.S.C. §§ 1956, 1956(h), and 1957, and was therefore subject to forfeiture in the first place. The Amended Complaint does not state the circumstances giving rise to the forfeiture claim with sufficient particularity that the Claimant can commence a meaningful investigation of the facts and draft a responsive pleading.

WHEREFORE, Claimant moves this court of a hearing on Claimant's motion; for an order dismissing the Amended Complaint with prejudice; for return of property seized by the Government; and for reasonable attorney's fees as provided by 28 U.S.C. § 2465(b)(1).

Dated: December 13, 2024　　　　　　Respectfully submitted,

By: /s/ Bradley L. Henry
Bradley Henry
BLANK ROME LLP
1271 Avenue of the Americas
New York, NY 10020
bradley.henry@blankrome.com

Attorney for Claimant Vipin Kumar
*Admitted Pro Hac Vice*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that, on December 13, 2024, I caused a copy of the foregoing Memorandum of Law in Support of Motion to Dismiss Amended Complaint to be filed electronically with the Court using the Court's CM/ECF system, which will transmit a notice of electronic filling to all counsel of record in this action.

/s/ Bradley L. Henry
Bradley L. Henry